# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

|  |  |
|---|---|
| CYNTHIA S. FERNANDES,<br> Plaintiff,<br><br>v.<br><br>FEDERAL RESERVE BANK OF BOSTON,<br> Defendant. | Civil Action No. 1-20-cv10270 |

## COMPLAINT

## I.   INTRODUCTION

Cynthia S. Fernandes ("Plaintiff" or "Ms. Fernandes"), by and through her undersigned counsel hereby files this Complaint against her former employer, the FEDERAL RESERVE BANK OF BOSTON ("Defendant" or "FRBB"), alleging that FRBB willfully violated 29 U.S.C. §206(d) (the "Equal Pay Act" or "EPA") and the Massachusetts Equal Pay Act, Mass. Gen. L. ch. 149, §105A ("MEPA"), when FRBB willfully paid Ms. Fernandes less in wages/compensation (salary, bonus, etc) than the men at the FRBB even though Ms. Fernandes performed substantially equal work to the work the men in the department, which required substantially equal skill, effort and responsibility. and which work was performed under similar working conditions within the same establishment.[1]  Specifically, Ms. Fernandes performed the same work as the three (3) male Audit Directors who worked at FRBB from 2016 through her

---

[1] Section (d)(1) of the EPA prohibits discrimination based on gender, stating: "[n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees *on the basis of sex* by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment *for equal work* on jobs the performance of which requires *equal skill, effort, and responsibility*, and which are performed under similar working conditions... (emphasis added)."

illegal termination in April 2019.[2]  In addition, Ms. Fernandes also performed  equal work as the male AGAs at the Federal Reserve from 2018 through April 2019, which required equal skill, effort and responsibility.

Not only was Ms. Fernandes paid less than men doing equal work, when she complained about this to her supervisor, her supervisor's supervisor and Human Resources, she was retaliated against when she was illegally terminated on April 9, 2019.  As a result of the retaliatory termination she suffered great emotional distress and pecuniary loss.

Lastly. Ms. Fernandes filed a Verified Charge of Particulars with the Equal Employment Opportunity Commission ("EEOC") on January 30, 2020, alleging that, while working for FRBB she suffered discriminatory acts, adverse employment decisions and retaliatory termination in violation of her civil rights in direct contravention of both Title II of the Civil Rights Act of 1964 (42 U.S.C. sub.ch. VI, §§ 2000e - 2000e-17), and 29 U.S.C. §206(d) ("Equal Pay Act" or "EPA").  The EEOC investigation is still ongoing, but does not prohibit from pursuing alleged violations of the EPA and Massachusetts Equal Pay Act.

## II.   VENUE and JURISDICTION

Venue is proper in the United States District Court of Massachusetts as the events and occurrences at issue in this matter substantially occurred in Boston, Massachusetts, where Ms. Fernandes worked for FRBB for almost eight years.

Further, pursuant to 28 U.S.C. §1331, this Court has original jurisdiction in this matter as the claims and controversies arise under the Constitution, laws or treaties of the United States,

---

[2] Ms. Fernandes also filed a "Verified Charge of Particulars" with the United States Equal Employment Opportunity Commission ("EEOC")on January 30, 2020 alleging violations of the EPA as well as a violation of her civil rights under Title II of the Civil Rights Act of 1964 (42 U.S.C. sub.ch. VI, §§ 2000e - 2000e-17) alleging discrimination by FRBB on the basis of gender.  This Complaint is filed at this time with the United States District Court of Massachusetts while the EEOC investigates the claims alleged in the Charge as the statute of limitations is not tolled for EPA violations even though a Claimant has filed a charge of discrimination with the EPA.

specifically this action arises under 29 U.S.C. §206(d) (the "Equal Pay Act" or "EPA"), which is a 1963 amendment to 29 U.S.C. §201 et seq. (the "Fair Labor Standards Act of 1938").

Further, this court has supplemental jurisdiction over the state law claims - alleged violations of Mass. Gen. L. Ch. 149, §105A, the "Massachusetts Equal Pay Act" ("MEPA"), pursuant to 28 U.S.C. §1367 as these alleged violations of Massachusetts law are so related to the EPA claims that they form part of the same case or controversy under Article III of the United States Constitution.

Lastly, this Court has personal jurisdiction over the parties here as Defendant is a corporation conducting business in the Commonwealth of Massachusetts.

## III.   FACTUAL ALLEGATIONS

1.      Cynthia Fernandes is a woman who resided in Everett, Massachusetts at all times relevant to this action.  Her gender is female.

2.      Ms. Fernandes was employed at the Federal Reserve Bank of Boston ("FRBB"), located in Boston Massachusetts.

3.      FRBB employs more than twenty (20) employees at the FRBB location.

4.      FRBB is located at 600 Atlantic Avenue, Boston, Massachusetts 02210.

5.      Plaintiff was hired by FRBB and started working for FRBB as an "Auditor" in August 2011.

6.      When Plaintiff was hired as an "Auditor," the next promotion levels were "Senior Auditor," then "Audit Director" - there were no "Lead Auditor" or "Audit Manager" positions at the time Plaintiff was hired.

7.      Plaintiff received excellent performance reviews from the time Plaintiff was hired to the time Plaintiff was illegally fired in 2019.

8.      Plaintiff was promoted to "Senior Auditor" on June 1, 2013.

9.      With her education, prior work experience and work ethic, Plaintiff was on track to be promoted to "Audit Director" at some point in 2015 or 2016.  Additionally, with the expected retirement of the General Auditor in 2015, it was anticipated that an Audit Director position would be vacant at that time.

10.     Nonetheless, FRBB created the "Lead Auditor" position in the summer of 2014 as an additional position between Senior Auditor and Audit Director.

11.     Plaintiff was promoted to "Lead Auditor" in 2015, with the expectation that the next promotion would be in the Audit Director position.

12.     Plaintiff's performance reviews throughout her employment at FRRB were excellent and Plaintiff almost always "exceeded expectations."  Plaintiff was an outstanding employee for FRBB.

13.     The overall "2 – Exceeds Expectations" performance rating was given to less than 10% of the employees in FRBB, and the "1 – Exceptional Performance" was given to less than 2% of the employees in FRBB.

14.     Throughout her time working at the Bank, Plaintiff consistently achieved those ratings; her performance ranked in the top 10% of the Bank's overall performance (considering a normal distribution curve) and Plaintiff was considered in the top six (6) of the roughly three hundred (300) auditors in the Federal Reserve System.

15.     This was further evidenced by the COGA Award Plaintiff received in 2017 for her performance and impact throughout the System.

16.     Throughout her time at FRBB, there were generally three (3) employees with the title of "Audit Directors".

17.     In 2016, a female Audit Director was replaced by a male Audit Director.

18.     The Audit Director positions reported directly to the Assistant General Auditor ("AGA").

19.     After this, at all times relevant to this matter, all three (3) Audit Directors were male.

20.     Jessica Whitten ("AGA Whitten"), an external hire, became the AGA in 2015 when the previous AGA quit the position in 2015.

21.     The three (3) Audit Directors reported directly to the AGA at all times relevant to this matter.

22.     The AGA reported directly to the General Auditor, who starting in the summer of 2015, was Jon Colvin ("GA Colvin").

23.     To the best of Plaintiff's knowledge, GA Colvin remains in the same role today.

24.     In mid-2016, when Plaintiff was a "Lead Auditor", Phil Richard ("AD Richard") was an Audit Director - Plaintiff had been reporting to him for some time before and he had done several performance reviews of Plaintiff.

25.     All of her reviews by AD Richard were excellent and Plaintiff always met expectations and often exceeded expectations.

26.     In 2015 - 2016, AD Richard was going through a divorce, applied for the AGA position when it became vacant in 2015.

27.     He was not selected for the AGA position.

28.     Both the failed attempt to land the AGA position and the divorce took a toll on his work in 2016.

29.     As such, Plaintiff was tasked with filling the void and essentially started doing the job of an Audit Director in mid-2016.

30.     Generally, an Audit Director is responsible for executing the audit plan, overseeing audit staff, developing staff through training and coaching, meeting with Senior Management within FRBB, overseeing the work noted in the Department's strategic plan, and supporting System level projects at the request of the General Auditor.

31.     When Plaintiff was tasked with filling the void left by AD Richard's performance, Plaintiff started reporting directly to AGA Whitten and was the only "Lead Auditor" with this reporting relationship, despite there being other employees with the "Lead Auditor" title.

32.     Plaintiff was performing in the role of an Audit Director at that point in 2016, even though her title was still "Lead Auditor", performing the job duties of an Audit Director described above.

33.     Plaintiff continued to perform the job duties of an Audit Director from that point in 2016 through her illegal termination on April 9, 2019.

34.     However, at no time from 2016 through 2019, was Plaintiff paid the same wage as the other Audit Directors at FRBB who were all males - Plaintiff received less in annual salary and annual bonuses and possibly other fringe benefits than the male Audit Directors.

35.     Both AGA Whitten and GA Colvin knew Plaintiff was doing the work of an Audit Director in 2016 and 2017, and also knew Plaintiff was not being compensated the same as the other male Audit Directors.

36.     In her 2017 performance review, AGA Whitten noted that "[Plaintiff] had a very successful year as Lead Auditor.  [Plaintiff] exceeded many of [her] business objectives and made significant contributions towards achievement of the department's strategy."

37.     Plaintiff's 2017 review noted her exceptional work on audits as both the "Auditor in Charge" where Plaintiff managed and oversaw specific audits.

38.     Plaintiff's 2017 review also noted her exceptional work where Plaintiff assisted on audits - it was noted that Plaintiff "played a valuable role on the System IRM Audit" and that, inter alia, "[Plaintiff] was seen as a key resource for department performance measures and metrics, questions pertaining to FMACC and the IRM Audit."

39.     Plaintiff's 2017 review also noted that Plaintiff was "highly regarded in the Bank and System audit community and received the annual Conference of General Auditor's ("COGA") "Award for Excellence". The award represents COGA's signature recognition for exceptional work in the field of internal audit in the Federal Reserve System."

40.     Plaintiff's 2017 review also noted that Plaintiff had "a strong ethical and moral compass. [Plaintiff] practiced what [Plaintiff] preached and demonstrated adherence to a set of high values and beliefs" and that Plaintiff "garnered trust from both Audit and Bank management."

41.     Plaintiff continued to perform the work of an Audit Director throughout the entirety of 2017, even though her title was still "Lead Auditor" and even though Plaintiff was being paid less in salary and bonus and other fringe benefits than the male Audit Directors.

42.     Plaintiff reported directly to AGA Whitten, same as the Audit Directors, throughout 2017 while Plaintiff did the same work as the Audit Directors.

43.     During this time, Plaintiff, with the job title of "Lead Auditor", was paid approximately thirty-thousand dollars less per year than an Audit Director and her annual bonus was significantly less than the Audit Directors (ten-to-fifteen thousand less per year).

44.     Plaintiff was told several times by management that at some point Plaintiff would be officially promoted, but that there was just no money in the budget at the time to do so.

45.     Because of these statements by management, Plaintiff believed she would be promoted to Audit Director in the near future as that is what she was told and Audit Director work was the work Plaintiff was doing.

46.     AGA Whitten left FRBB in November 2017.

47.     At that point going forward, in addition to the work of an Audit Director, Plaintiff started to do some of the work of the AGA while the position was unfilled.

48.     Nonetheless, instead of being promoted to Audit Director, Plaintiff was promoted to the newly-created position of "Audit Manager" by GA Colvin - that was effective January 1, 2018.

49.     This was disappointing as Plaintiff had been performing the job duties of an Audit Director since 2016 and had just stepped up to perform some of the work of the AGA while that position was unfilled.

50.     Plaintiff talked to GA Colvin and he assured Plaintiff that she was doing excellent work and that Plaintiff would be promoted to an Audit Director "soon," but he continued to insist there was no money in the budget to pay Plaintiff more.

51.     Alicia Grasfeder ("AGA Grasfeder"), was hired in approximately February 2018 to replace AGA Whitten - again an outside hire.

52.     Plaintiff, in the newly-created position of Audit Manager, reported directly to AGA Grasfeder.

53.     AGA Grasfeder had five (5) direct reports - three (3) male Audit Directors, a female "Audit Manager," (Plaintiff) and an "Executive Assistant" that was shared between GA Colvin and AGA Grasfeder.

54.     Plaintiff was paid less than the three (3) male Audit Directors, by approximately ten-to-fifteen thousand dollars in annual salary, plus less in bonus, as her annual bonus was significantly less than the Audit Directors (ten-to-fifteen thousand less).

55.     This was the case for all of 2018 and 2019 while Plaintiff was employed at FRBB.

56.     Both AGA Grasfeder and GA Colvin knew this was the case.

57.     In March 2018, Plaintiff spoke with GA Colvin and AGA Grasfeder about the pay differential between Plaintiff and the three (3) male Audit Directors.

58.     They all talked about how Plaintiff was doing the same work and being paid less.

59.     Plaintiff again was told there was no room in the budget, but that Plaintiff would be promoted "soon."

60.     During 2018, Plaintiff continued to do the same work as the male Audit Directors while being paid less - and all of this was known to GA Colvin and AGA Grasfeder.

61.     Further, AGA Grasfeder also started to assign Plaintiff work that was expected from the AGA position.

62.     AGA Grasfeder did this, because Plaintiff had been helping fill the AGA role since AGA Whitten left the position and quite frankly, because Plaintiff would and could do the additional work.

63.     Throughout 2018 and 2019 Plaintiff continued to do the work of an Audit Director while taking on more of the work of AGA Grasfeder.

64.     In August 2018, Plaintiff went to Human Resources - Kate Bender - to discuss the best approach to discuss workloads and priorities with AGA Grasfeder, as Plaintiff made several attempts to communicate why her workload was unreasonable - she was essentially doing two jobs.

65.     Plaintiff shared a spreadsheet of her assigned tasks and estimations on the time it would take to execute the tasks, and noted that her workload was greater than that of the Audit Directors.

66.     Unfortunately, HR did nothing.

67.     AGA Grasfeder continued to assign more and more of her work to Plaintiff, while also knowing Plaintiff was doing the work of an Audit Director.

68.     AGA Grasfeder would disappear for hours on end several times a week - she started to take classes off-site.

69.     Plaintiff had to attend meetings for AGA Grasfeder, make presentations for her and AGA Grasfeder even put Plaintiff in charge of the budget in late 2018.

70.     AGA Grasfeder would often send Plaintiff an email a day or two before a task was due - something AGA Grasfeder was responsible for - and she would ask Plaintiff to do the work with the short notice.

71.     Plaintiff did the AGA work AGA Grasfeder requested on the short notice.

72.     Nonetheless, Plaintiff continued to be paid less than the male Audit Directors, and obviously Plaintiff was paid less than the male AGAs throughout the Federal Reserve System - there were twelve (12) FRB branches throughout the United States, and at that time, three (3) of the AGA's were males.

73.     The stress of completing an Audit Director job while also performing substantially similar work as an AGA was a significant challenge for Plaintiff, which caused her much stress and anxiety.

74.     Plaintiff started going to therapy in October 2018 to deal with her emotional distress caused by the stress and anxiety she experienced at work at FRBB.

75.     Plaintiff was diagnosed with Generalized Anxiety Disorder ("GAD") in late 2018.

76.     One of the symptoms of GAD is overperforming when tasks are ambiguous, novel, or uncertain, i.e., Plaintiff was predisposed to keep doing the additional work she was being assigned by AGA Grasfeder.  Her anxiety drove her to complete the additional AGA-work AGA Grasfeder was assigning her.

77.     In October 2018, Plaintiff communicated to AGA Grasfeder that the additional workload she was asking of Plaintiff was triggering her GAD and Plaintiff felt she was on overdrive to complete the extra work.

78.     Plaintiff consistently discussed her workload and how Plaintiff was assigned double the work of other Audit Directors and executing on her tasks.

79.     AGA Grasfeder reassured Plaintiff that she was communicating with GA Colvin about her workload and that she would make a job change for Plaintiff.

80.     Plaintiff thought she was going to be promoted to "Audit Director" and given clearer tasks and not asked to do AGA Grasfeder's job as well.

81.     On October 31, 2018, Plaintiff was  "promoted" to a newly-created position - "Professional Practices and Development Manager", without being given a raise or a concrete description of her job expectations.

82.     When notice of the new position was emailed to Plaintiff, the title was called the "Professional Practices and Development Director" and was then changed to "Professional Practices and Development Manager" without an explanation.

83.     In this role, Plaintiff was responsible for the oversight of the Executive Assistant (who previously reported to GA Colvin and AGA Grasfeder), 2 junior staff, and indirect oversight of 5 senior staff members.

84.     All other Audit Directors were responsible for 3-4 staff members.

85.     In this newly made up position, Plaintiff was once again assigned work that was traditionally executed by the Audit Director and the AGA, and Plaintiff continued to do Audit Director work and AGA work.

86.     Plaintiff continued to report directly to AGA Grasfeder, while not being compensated as either an Audit Director or AGA.

87.     Both GA Colvin and AGA Grasfeder knew this was the case in 2018 and 2019.

88.     In November 2018, Plaintiff had a similar conversation with AGA Grasfeder about the pay discrepancy - nothing changed.

89.      In February 2019, Plaintiff met with AGA Grasfeder about her goals and objectives for the new year.

90.     The meeting took place in AGA Grasfeder's office and AGA Grasfeder closed the door.

91.     AGA Grasfeder gave Plaintiff her goals and objectives - it was clear that she had just copied and pasted her own yearly AGA goals and objectives into the section for Plaintiff.

92.     Plaintiff was obviously concerned about her upcoming job duties and goals and her being paid significantly less than an AGA and an Audit Director.

93.     Plaintiff told AGA Grasfeder that Plaintiff was doing Audit Director work, but being paid less than the Audit Directors who were all males, and that now she was asking Plaintiff to continue to de essentially the AGA's job as well.  Plaintiff told AGA Grasfeder that this was not right.

94.     In response, AGA Grasfeder told Plaintiff, "you will never be promoted to an Audit Director", that "you are less than the men in this Department" and "you only exist in order to make my job easier."

95.     Plaintiff was stunned and devastated by AGA Grasfeder's response and did not know what to do.

96.     Plaintiff met with GA. Colvin alone shortly after that meeting with AGA Grasfeder and he told Plaintiff "to work it out" with AGA Grasfeder.

97.     Plaintiff also went to HR and talked with Kate Bender again.  Plaintiff told  HR of the reasons Plaintiff met with AGA Grasfeder, AGA Grasfeder's discriminatory comments she made towards Plaintiff.

98.     Plaintiff also told HR that she was very upset by AGA Grasfeder's comments and that Plaintiff was concerned about how this would impact her future at FRBB.

99.     Plaintiff also once again told HR that she had been doing Audit Director work for several years without being properly promoted to Audit Director and while not being paid the same as the three (3) male Audit Directors at FRBB.

100.    Plaintiff also told HR that Plaintiff had been doing AGA work for quite some time without being paid the same as an AGA and that AGA Grasfeder essentially copied and pasted her goals and objectives for 2019 into her goals and objectives for 2019.

101.    HR told Plaintiff they understood why the comments AGA Grasfeder made to Plaintiff would upset Plaintiff and they understood her concerns.  HR told Plaintiff they would "have a solution" and that they would get back with Plaintiff.

102.    HR suggested Plaintiff go on her scheduled vacation that was coming up and that there would be a meeting on April 8, 2019, after Plaintiff returned, to discuss the "solution."

103.     Plaintiff went on her vacation and returned April 2, 2019.  Plaintiff was confident that things would be worked out.

104.     Plaintiff spent that first week back getting caught up on her work.

105.     Plaintiff went to the meeting with HR on April 8, 2019 and HR told Plaintiff to go home that day.  HR told Plaintiff that she had sent an email in which "her tone" was "insubordinate" to AGA Grasfeder and that Plaintiff was insubordinate for meeting with GA Colvin to discuss the issues with pay discrepancy and the discriminatory comments AGA Grasfeder made towards Plaintiff.

106.     Plaintiff was stunned and appalled at HR's response.  Plaintiff cried several times that day and was completely confused by HR's "solution."

107.     Even though HR told her to go home, when she asked HR if she was fired, HR said "no."

108.     The next day, April 9, 2019, HR called Plaintiff and told her she was fired.

109.     This illegal termination caused Plaintiff great emotional distress and financial hardship as well.

## <u>COUNT I</u>
**Violation of the 29 U.S.C. §206(d), the Equal Pay Act Amendment to 29 U.S.C. §201 et seq., (the "Fair Labor Standards Act of 1938") for the Unequal Payment of Wages Based on Gender (AUDIT DIRECTOR)**

110.     All allegations in the preceding paragraphs are incorporated herein.

111.     Plaintiff is of female gender.

112.     Plaintiff was employed by FRBB from August 2011 to April 9, 2019, in Boston, Massachusetts.

113.     From June 2016 through April 9, 2019 Plaintiff performed the work of an Audit Director.

114.    There were three (3) male Audit directors during this same time period.

115.    Plaintiff and the three (3) male Audit Directors performed equal work during this same time period.

116.    The job duties Plaintiff and the three (3) male Audit Directors performed required equal skill, effort and responsibility.

117.    Nonetheless, Plaintiff was paid significantly less in wages than the three (3) male Audit Directors for the period of June 2016 through April 2019.

118.    Further, Plaintiff was paid significantly less in annual bonus than the three (3) male Audit Directors during each of these years.

119.    Further, Plaintiff received less in wages/total compensation/fringe benefits that the three (3) male Audit Directors during each of these years.

120.    There was no legal justification for FRBB to pay Plaintiff less in annual salary, annual bonus and other wages/compensation/fringe benefits to Plaintiff, a female, than to the three (3) male Audit directors.

121.    From mid-2016 through April 2019, the FRBB's managers, the AGA and the GA, knew Plaintiff, a female, was being paid less than the male Audit Directors even though she was doing substantially similar work than the three (3) male Audit Directors.

122.    Plaintiff talked with GA Colvin and the AGA several times about this from 2016 through 2019 - there was always an excuse about "no money in the budget" to pay Plaintiff the same as the male Audit Directors.

123.    In February 2019, Plaintiff met with AGA Grasfeder in AGA Grasfeder's office - behind closed doors.  Plaintiff, inter alia, once again brought up the fact that she was being paid

much less than the male Audit Directors even though she was doing the same (and more) work than male Audit Directors.

124.    In response, AGA Grasfeder told Plaintiff, "you will never be promoted to an Audit Director", that "you are less than the men in this Department" and "you only exist in order to make her job easier."

125.    Plaintiff told GA Colvin and HR what occurred in that meeting with AGA Grasfeder and nothing was done.

126.    After going on vacation right after the meeting with HR, Plaintiff returned on or about April 2, 2019 and caught up on her work.  A meeting with HR and AGA Grasfeder was set for April 8, 2019.

127.    At that meeting she was told to go home, but that she was not being fired.

128.    On April 9, 2019 Plaintiff received a call from FRBB that her employment had been terminated.

129.    FRBB retaliated against Plaintiff by illegally terminating her in response to her complaining about doing the work of an Audit Director and not being paid the same.

130.    FRBB's violation of the EPA was willful and intentional.

## COUNT II
**Violation of the 29 U.S.C. §206(d), the Equal Pay Act Amendment to 29 U.S.C. §201 et seq., (the "Fair Labor Standards Act of 1938") for the Unequal Payment of Wages Based on Gender (AGA)**

131.    All allegations in the preceding paragraphs are incorporated herein.

132.    Plaintiff is of female gender.

133.    Plaintiff was employed by FRBB from August 2011 to April 9, 2019, in Boston, Massachusetts.

134.    From June 2016 through April 9, 2019 Plaintiff performed the work of an Audit Director.

135.    In addition, at some point in late 2017, after AGA Whitten resigned, Plaintiff started to do the work of an AGA to fill the void of the open position.

136.    AGA Grasfeder was hired for the role of AGA in early 2018.

137.    In addition to her Audit Director work, Plaintiff continued to do some of the job duties of AGA Grasfeder.

138.    These AGA job responsibilities increased throughout 2018 and Plaintiff was doing substantially similar work as an AGA without being paid as an AGA..

139.    Plaintiff talked to AGA Grasfeder about this on several occasions - complaining that she was doing the work of an AGA, in addition to the work of an Audit Director, without being paid for that work.

140.    Plaintiff also complained about the work load of doing two jobs and the stress and anxiety it was causing her.

141.    In response, nothing changed and AGA Grasfeder gave Plaintiff AGA duties and responsibilities while Plaintiff also was doing Audit Director work.

142.    This occurred throughout 2018 and through 2019 - until Plaintiff was illegally terminated in April 2019.

143.    During this time period, Plaintiff did equal work requiring equal skill, effort and responsibility, as male AGAs throughout the Federal Reserve system, but was not paid the same in wages/bonuses/other benefits as male AGAs.

144.    FRBB knew this was happening, but did nothing.

## **COUNT III**

**Violation of the 29 U.S.C. §215(a)(3) of the "Fair Labor Standards Act of 1938"
for Terminating Plaintiff's Employment in Retaliation for Complaining About EPA Violations**

145.    All allegations in the preceding paragraphs are incorporated herein.

146.    Plaintiff complained to GA Colvin, either AGA Whitten or AGA Grasfeder and Human Resources about being paid less than the male Audit Directors on multiple occasions from mid-2016 through her illegal termination in April 2019.

147.    The FRBB's managers, the AGA and the GA, knew Plaintiff, a female, was being paid less than the male Audit Directors from mid-2016 through April 2019, even though she was doing substantially similar work than the three (3) male Audit Directors.

148.    FRBB's managers, the GA and the AGA also knew that Plaintiff, a female, had started doing AGA work in late 2017 and that the AGA work increased throughout 2018 and into 2019.

149.    FRBB's managers, the GA and the AGA, also knew that Plaintiff was not being paid the same as male AGA's throughout the Federal Reserve System.

150.    Plaintiff complained about doing AGA work and not being paid for AGA work several times throughout 2018 and 2019 - including at the February 2019 meeting with AGA Grasfeder and subsequent meetings with GA Colvin and HR.

151.    Plaintiff reasonably believed that FRBB was violating the law by not paying her the same as male Audit Directors and male AGAs.

152.    In that meeting and in response, AGA Grasfeder told Plaintiff, "you will never be promoted to an Audit Director", that "you are less than the men in this Department" and "you only exist in order to make her job easier."

153.    Plaintiff then met with GA. Colvin alone shortly after the meeting with AGA Grasfeder to discuss what occurred.

154.    GA Colvin told Plaintiff "to work it out" with AGA Grasfeder.

155.    Plaintiff also went to Human Resources (Kate Bender) in March 2019 and told Ms. Bender of what occurred and what was said at Plaintiff's meeting with AGA Grasfeder and her discriminatory comments.

156.    Plaintiff also told HR that she was very upset by these comments and that she was concerned about how this would impact her career/future at FRBB.

157.    Plaintiff also told HR that she had been doing Audit Director work for several years without being properly promoted to Audit Director and without being paid the same as the three (3) male Audit Directors at FRBB.

158.    Plaintiff also told HR that she had been doing more and more AGA work in addition to the Audit Director work and that AGA Grasfeder had essentially copy and pasted her AGA goals and objectives into Plaintiff's for 2019.

159.    Both AGA Grasfeder and Plaintiff had scheduled vacations in the middle/end of March 2019.  HR told Plaintiff to go on vacation and that HR would find a "solution" to the issue with AGA Grasfeder.

160.    Plaintiff legitimately thought HR was going to provide a solution to the problem and she went on her vacation in March 2019.

161.    Plaintiff returned on or around April 2, 2019 and caught up on her work.  A meeting with HR and AGA Grasfeder was set for April 8, 2019.

162.    At that meeting she was told to go home, but that she was not being fired.

163.     On April 9, 2019 Plaintiff received a call from FRBB that she had been

terminated.

164.     FRBB retaliated against Plaintiff by illegally terminating her employment on

April 9, 2019 because she complained about being paid less than the three (3) male Audit

Directors and that she was also being asked to do more AGA work without being paid as an

AGA.

## COUNT IV
### Violation of Mass. Gen. L. Ch. 149, §105A, the "Massachusetts Equal Pay Act" ("MEPA") for
### Unequal Payment of Wages Based on Gender (AUDIT DIRECTOR)

165.     All allegations in the preceding paragraphs are incorporated herein.

166.     Plaintiff is of female gender.

167.     Plaintiff was employed by FRBB from August 2011 to April 9, 2019, in Boston,

Massachusetts.

168.     FRBB is a covered employer under the MEPA.

169.     From June 2016 through April 9, 2019 Plaintiff performed the work of an Audit

Director.

170.     There were three (3) male Audit directors during this same time period.

171.     Plaintiff and the three (3) male Audit Directors performed equal work during this

same time period.

172.     The job duties Plaintiff and the three (3) male Audit Directors performed required

equal skill, effort and responsibility.

173.     Nonetheless, Plaintiff was paid significantly less in wages than the three (3) male

Audit Directors for the period of June 2016 through April 2019.

174.     Further, Plaintiff was paid significantly less in annual bonus than the three (3) male Audit Directors during each of these years.

175.     Further, Plaintiff received less in wages/total compensation/fringe benefits that the three (3) male Audit Directors during each of these years.

176.     There was no legal justification for FRBB to pay Plaintiff less in annual salary, annual bonus and other wages/compensation/fringe benefits to Plaintiff, a female, than to the three (3) male Audit directors.

177.     The FRBB's managers, the AGA and the GA, knew Plaintiff, a female, was being paid less than the male Audit Directors even though she was doing substantially similar work than the three (3) male Audit Directors.

178.     Plaintiff talked with GA Colvin and the AGA several times about this from 2016 through 2019 - there was always an excuse about "no money in the budget" to pay Plaintiff the same as the male Audit Directors.

179.     In February of 2019, Plaintiff met with AGA Grasfeder in AGA Grasfeder's office - behind closed doors.  Plaintiff, inter alia, once again brought up the fact that she was being paid much less than the male Audit Directors even though she was doing the same (and more) work than male Audit Directors.

180.     In response, AGA Grasfeder told Plaintiff, "you will never be promoted to an Audit Director", that "you are less than the men in this Department" and "you only exist in order to make her job easier."

181.     Plaintiff was stunned and devastated by AGA Grasfeder response and did not know what to do.

182.    Plaintiff then met with GA. Colvin alone shortly after the meeting with AGA Grasfeder to discuss what occurred.

183.    GA Colvin told Plaintiff "to work it out" with AGA Grasfeder.

184.    Plaintiff also went to Human Resources ("HR", Kate Bender) in March 2019 and told Ms. Bender of what occurred and what was said at Plaintiff's meeting with AGA Grasfeder and her discriminatory comments.

185.    Plaintiff also told HR that she was very upset by these comments and that she was concerned about how this would impact her career/future at FRBB.

186.    Plaintiff also told HR that she had been doing Audit Director work for several years without being properly promoted to Audit Director and without being paid the same as the three (3) male Audit Directors at FRBB.

187.    Both AGA Grasfeder and Plaintiff had scheduled vacations in the middle/end of March 2019.  HR told Plaintiff to go on vacation and that HR would find a "solution" to the issue with AGA Grasfeder.

188.    Plaintiff legitimately thought HR was going to provide a solution to the problem and she went on her vacation in March 2019.

189.    She returned on or around April 2, 2019 and caught up on her work.  A meeting with HR and AGA Grasfeder was set for April 8, 2019.

190.    At that meeting she was told to go home, but that she was not being fired.

191.    On April 9, 2019 Plaintiff received a call from FRBB that she had been terminated.

192.     FRBB retaliated against Plaintiff by illegally terminating her employment on April 9, 2019 because she complained about being paid less than the three (3) male Audit Directors.

**COUNT V**
**Violation of Mass. Gen. L. Ch. 149, §105A, the "Massachusetts Equal Pay Act" ("MEPA") for**
**Unequal Payment of Wages Based on Gender (AGA)**

193.     All allegations in the preceding paragraphs are incorporated herein.

194.     Plaintiff is of female gender.

195.     Plaintiff was employed by FRBB from August 2011 to April 9, 2019, in Boston, Massachusetts.

196.     From June 2016 through April 9, 2019 Plaintiff performed the work of an Audit Director.

197.     In addition, at some point in late 2017, after AGA Whitten resigned, Plaintiff started to do the work of an AGA to fill the void of the open position.

198.     AGA Grasfeder was hired for the role of AGA in early 2018.

199.     In addition to her Audit Director work, Plaintiff continued to do some of the job duties of AGA Grasfeder.

200.     These AGA job responsibilities increased throughout 2018 and Plaintiff was doing substantially similar work as an AGA without being paid as an AGA.

201.     Plaintiff talked to AGA Grasfeder about this on several occasions - complaining that she was doing the work of an AGA, in addition to the work of an Audit Director, without being paid for that work.

202.    Plaintiff also complained about the work load of doing two jobs and the stress and anxiety it was causing her.

203.    In response, nothing changed and AGA Grasfeder gave Plaintiff AGA duties and responsibilities while Plaintiff also was doing Audit Director work.

204.    This occurred throughout 2018 and through 2019 - until Plaintiff was illegally terminated in April 2019.

205.    During this time period, Plaintiff did equal work requiring equal skill, effort and responsibility, as male AGAs throughout the Federal Reserve system, but was not paid the same in wages/bonuses/other benefits as male AGAs.

206.    FRBB knew this was happening, but did nothing.

### COUNT VI
### Violation of Mass. Gen. L. Ch. 149, §105A, the "Massachusetts Equal Pay Act" ("MEPA") for
### for Terminating Plaintiff's Employment in Retaliation for Complaining About MEPA Violations

207.    All allegations in the preceding paragraphs are incorporated herein.

208.    Plaintiff complained to GA Colvin, either AGA Whitten or AGA Grasfeder and Human Resources about being paid less than the male Audit Directors on multiple occasions from mid-2016 through her illegal termination in April 2019.

209.    The FRBB's managers, the AGA and the GA, knew Plaintiff, a female, was being paid less than the male Audit Directors from mid-2016 through April 2019, even though she was doing substantially similar work than the three (3) male Audit Directors.

210.    FRBB's managers, the GA and the AGA also knew that Plaintiff, a female, had started doing AGA work in late 2017 and that the AGA work increased throughout 2018 and into 2019.

24

211.    FRBB's managers, the GA and the AGA, also knew that Plaintiff was not being paid the same as male AGA's throughout the Federal Reserve System.

212.    Plaintiff complained about doing AGA work and not being paid for AGA work several times throughout 2018 and 2019 - including at the February 2019 meeting with AGA Grasfeder and subsequent meetings with GA Colvin and HR.

213.    Plaintiff reasonably believed that FRBB was violating t*he law by not paying her the same as male Audit Directors and male AGAs.

214.    In that meeting and in response, AGA Grasfeder told Plaintiff, "you will never be promoted to an Audit Director", that "you are less than the men in this Department" and "you only exist in order to make her job easier."

215.    Plaintiff then met with GA. Colvin alone shortly after the meeting with AGA Grasfeder to discuss what occurred.

216.    GA Colvin told Plaintiff "to work it out" with AGA Grasfeder.

217.    Plaintiff also went to Human Resources (Kate Bender) in March 2019 and told Ms. Bender of what occurred and what was said at Plaintiff's meeting with AGA Grasfeder and her discriminatory comments.

218.    Plaintiff also told HR that she was very upset by these comments and that she was concerned about how this would impact her career/future at FRBB.

219.    Plaintiff also told HR that she had been doing Audit Director work for several years without being properly promoted to Audit Director and without being paid the same as the three (3) male Audit Directors at FRBB.

220.     Plaintiff also told HR that she had been doing more and more AGA work in addition to the Audit Director work and that AGA Grasfeder had essentially copy and pasted her AGA goals and objectives into Plaintiff's for 2019.

221.     Both AGA Grasfeder and Plaintiff had scheduled vacations in the middle/end of March 2019.  HR told Plaintiff to go on vacation and that HR would find a "solution" to the issue with AGA Grasfeder.

222.     Plaintiff legitimately thought HR was going to provide a solution to the problem and she went on her vacation in March 2019.

223.     Plaintiff returned on or around April 2, 2019 and caught up on her work.  A meeting with HR and AGA Grasfeder was set for April 8, 2019.

224.     At that meeting she was told to go home, but that she was not being fired.

225.     On April 9, 2019 Plaintiff received a call from FRBB that she had been terminated.

226.     FRBB retaliated against Plaintiff by illegally terminating her employment on April 9, 2019 because she complained about being paid less than the three (3) male Audit Directors and that she was also being asked to do more AGA work without being paid as an AGA.

**WHEREFORE**, Plaintiff prays for the following relief from this Court:

a.   lost wages for three (3) years prior to filing for FRBB's willfully not paying her equal to the male Audit Directors at FRBB dating back three (3) years from the filing of this Complaint;

b.   additional liquidated damages in the amount equal to the lost wages detailed in "a." above;

c.   lost wages for three (3) years prior to filing this Complaint for FRBB's willfully not paying her equal to the male AGAs within the Federal Reserve system;

d.   additional liquidated damages in the amount equal to the lost wages detailed in "c." above;

e.   lost income for retaliating against Plaintiff by illegally firing her on April 9, 2019;

f.   emotional distress damages for retaliating against Plaintiff by illegally firing her on April 9, 2019;

g.   punitive damages for retaliating against Plaintiff by illegally firing her on April 9, 2019;

h.   reasonable attorneys fees and costs; and

i.   any other relief this Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY**

Respectfully Submitted,

Plaintiff, Cynthia S. Fernandes,

By her attorneys:

   /s/ Robert Richardson
Robert Richardson (BBO# 676947)
r.richardson@rc-llp.com
Edward C. Cumbo (BBO # 661284)
e.cumbo@rc-llp.com
225 Franklin St., 26th Floor
Boston, MA 02110
Tel: 617-217-2779
Fax: 888-512-1599

February 12, 2020